IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| v. | : | |
| CARLOS FIGUEROA | : | NO. 08-38 |

MEMORANDUM

McLaughlin, J.                                                     May 25, 2010

       On January 22, 2008, Carlos Figueroa was charged with distribution of heroin, distribution of cocaine, possession of a firearm in furtherance of a drug trafficking offense, and possession of a firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year. The Court held a jury trial from December 14 until December 17, 2009. After the government rested its case on December 16, 2009, the defendant moved for judgment of acquittal as to the two drug offenses.[1] He argued that the government had not established a sufficient chain of custody. The Court heard argument from both parties and reserved on the motion so that it could review the trial transcript.

       The jury found Mr. Figueroa guilty of the two distribution charges and of possession of a firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year. The jury could not reach a verdict as to

---

[1] In his brief to support his motion, the defendant also moved for judgment of acquittal as to the gun charges.

possession of a firearm in furtherance of a drug trafficking offense, and so the Court declared a mistrial for that charge. After the trial concluded, the parties submitted briefs to support their positions with respect to the defendant's motion for acquittal.  Upon reviewing the parties' briefs and the trial transcripts, the Court had concerns about the chain of custody established for the heroin and the cocaine.  It detailed these concerns in a long order scheduling oral argument on the defendant's motion.[2]  Oral argument on the defendant's motion was held on April 27, 2010.  After oral argument, the parties submitted additional writings.  Upon consideration of the defendant's motion, the parties' arguments during trial and during oral argument, and the parties' briefs and supplemental writings, the Court will deny the defendant's motion.

I.   The Trial Record

   A.   Heroin

   The first sale of drugs occurred in the afternoon on December 14, 2006.  Police Officer Brian Myers testified that during the afternoon on December 14, 2006, the defendant sold to him four blue, glassine packets stamped "Everlast," alleged to

---

[2] The Court noted that the government appeared to establish a sufficient chain of custody for the gun, but it permitted argument on this issue.

contain heroin, in exchange for forty dollars.[3]  Trial Tr. Vol. 1, 38:24-39:2.[4]

At trial, Officer Myers identified Exhibit 1, a property receipt with his signature, which described the narcotics purchased during the first drug sale.  1:45:20-46:4.  Officer Myers testified that the property receipt listed the evidence as four clear, heat-sealed, plastic packets, each containing a blue, glassine insert stamped "Everlast."  1:46:13-18.  Exhibit 1 was admitted into evidence.  1:46:5-9.

Officer Myers never identified the physical evidence from the first drug sale, the alleged heroin that the defendant was charged with distributing.  As such, he also did not compare the property receipt number found on the physical evidence to the number on the property receipt.[5]

Officer Myers testified generally about police procedure with respect to the transport of confiscated drugs from

---

[3] Although Police Officer Brian Myers testified that he purchased alleged heroin during the first sale, conducted in the afternoon on December 14, 2006, and during the second sale, conducted in the evening that same day, the government charged the defendant with distribution of heroin for only the first sale of drugs.

[4] For ease of reference, the Court will cite to the trial transcript as follows: volume number: page number: line number.

[5] Officer Myers stated that after he bought the alleged heroin, he returned to police headquarters and conducted a field test on the drugs.  The drugs tested positive for heroin.  1:49:2-7.  Officer Myers, however, did not identify the physical evidence that he field tested.

police headquarters to the police chemistry lab for chemical analysis. He stated that after he field tests drugs, the drugs are placed on a property receipt and shipped to the police chemistry lab for further analysis. 1:49:10-16. Officer Myers, however, did not testify specifically as to how the alleged heroin from the first drug sale was transported from his custody to that of the lab.

Ninan Varughese, a forensic scientist in the Philadelphia Police Department chemistry lab, testified as an expert witness. He identified Exhibit 2B as the physical evidence he received for analysis.[6] 2:117:6-16. Mr. Varughese explained that he could identify the physical evidence based on the lab number, property receipt number, and report stapled to the evidence. He also identified his signature on the heat seal of the evidence. 2:117:11-16. The government moved Exhibit 2B into evidence.[7] 2:119:19-25.

Mr. Varughese explained that generally, when he receives evidence, he checks the numbers to ensure that the

---

[6] From the record, it appears that the government first showed Mr. Varughese Exhibit 2A for identification, but Mr. Varughese explained that Exhibit 2A contained substances analyzed by another chemist. 2:115:19-116:20.

[7] There was some confusion as to the exhibit number. Initially, the government requested to move Exhibit 2C into evidence, but after the Court and the defendant questioned the exhibit number, the government recognized that the exhibit was 2B. 2:118:25-119:20.

4

numbers on the evidence correspond to those on the property receipt. 2:118:11-14. Mr. Varughese, however, did not testify that he performed this cross check for the drugs that he tested.

Mr. Varughese next identified Exhibit 2C, the laboratory report he prepared for the evidence found in Exhibit 2B.[8] 2:120:8-14. He testified that his report noted that Exhibit 2B contained four clear, heat-sealed, blue-glazed packets stamped "Everlast." 2:120:21-121:1. Upon analysis of one of the packets, the substance inside the packet was found to contain heroin. 2:121:8-11. Mr. Varughese did not testify that the property receipt number on his laboratory report corresponded to the property receipt number on the physical evidence.

Mr. Varughese also testified as to how he received the evidence. He explained that the physical evidence and related paperwork, including the property receipt, were placed in his personal locked bin. 2:117:20-118:3. He did not explain who delivered the evidence to that locked bin.

B. Cocaine

The second sale of drugs occurred in the evening on December 14, 2006. Officer Myers explained that during the first drug sale, the defendant mentioned that he could sell Officer

---

[8] The government later referred to Exhibit 2C as the lab report for the cocaine. 2:141:11-18. This is incorrect. Exhibit 2C is the lab report for the heroin.

5

Myers "powder," meaning cocaine. 1:59:16-24. Upon hearing this information, Officer Myers decided to make a second drug purchase later that day. 1:60:6-7. In the evening on December 14, 2006, Officer Myers bought four more bags of alleged narcotics from the defendant: two blue, glassine packets stamped "Everlast," allegedly containing heroin, and two clear packets with blue number "1's" on one side, allegedly containing cocaine. 1:40:25-41:3.

At trial, Officer Myers identified Exhibit 2, a property receipt recording the narcotics purchased during the second drug sale and those seized during the execution of a search warrant that occurred after the second sale. 1:47:8-21. It appears that Officer Myers may have identified his signature on the property receipt, but the record is unclear. The government introduced Exhibits 2 and 2A at the same time, and the government asked Officer Myers to identify the signature on Exhibit 2A, not Exhibit 2. 1:46:22-47:2. Exhibit 2 was admitted into evidence. 1:47:11-14.

Officer Myers then identified Exhibit 2A. Exhibit 2A, he stated, comprised two blue glassine packets, both stamped "Everlast," containing alleged heroin, and two clear packets with number "1's," containing alleged cocaine. He identified the items as the physical evidence from the second drug sale. 1:47:22-48:4. He did not compare the property receipt number on

6

the property receipt to that on the physical evidence.

Officer Myers did not provide any testimony as to how the alleged cocaine from the second sale was transported from his possession to that of the chemistry lab for analysis.

German Madera, a forensic scientist in the Philadelphia Police Department chemistry lab, testified as an expert witness. He identified Exhibit 13 as a report that he generated after completing a chemical analysis of narcotics. 2:104:2-25. He explained that the report contained the lab identification number, the district control number, the property receipt number for the items tested, and the defendant's name. 1:104:23-25. Mr. Madera identified Carlos Figueroa as the defendant named on the report. 2:105:1-2. Exhibit 13 was admitted into evidence. 2:104:15-19.

Mr. Madera testified that the items he was to analyze were two clear Ziploc packets containing white powder. 2:105:6-9. He tested one of the packets and it tested positive for cocaine. 2:105:10-13. Mr. Madera did not identify the physical evidence that he tested. As such, he did not compare the property receipt number found on the physical evidence to that recorded on his report.

C. The Gun

On the third day of trial, Police Officer James

7

Trappler testified for the government.[9] He explained that he recovered a .32 caliber semi-automatic gun from the glove compartment of the car in which Mr. Figueroa rode and which the police stopped moments after the second drug sale. 3:10:1-4. He identified Exhibit 2A as the gun that he confiscated from the glove compartment.[10] 3:10:12-16. Police Officer Trappler also

---

[9] The government announced that it would rest its case on the second day of trial. At that point, Firearms Examiner Police Officer Robert Stott had testified that he analyzed a gun, but there was no testimony from the police officer who recovered the gun, nor was there testimony explaining how the gun was delivered to the Firearms Investigation Unit for firearm analysis.

The Court alerted counsel to its concerns with respect to the chain of custody for the gun. 2:143:24-149:14. The government explained to the Court that it had difficulty bringing in witnesses to testify about the gun's chain of custody. The Court reminded the government that it had been willing to grant a continuance should the government need more time to gather its witnesses. 2:147:17-148:3. The government then requested a short continuance to find two additional witnesses who could help establish the gun's chain of custody. The Court granted the government's request, and it dismissed the jury midday through the second day of trial. 2:151:13-154:2. Police Officer James Trapper and Sergeant Marshall Freer testified for the government on the third day of trial.

[10] Officer Myers identified Exhibit 2A as the narcotics recovered from the second sale. Officer Trappler identified Exhibit 2A as the gun he recovered. Sergeant Freer identified Exhibit 2A as the gun he received from Officer Trappler, and the gun was moved into evidence as Exhibit 2A during Sergeant Freer's testimony. 3:41:12-16.

The defendant notes in his brief that Exhibit 2A, as the gun, was improperly marked and may have never been moved into evidence because it was initially identified and moved into evidence as the drugs from the second sale. The Court finds that, although the exhibit numbering was confusing and not always accurate at trial, the exhibits were sufficiently identified and moved into evidence.

testified that after he recovered the gun, he showed it to Officer Myers and then gave it to Sergeant Marshall Freer. 3:11:3-12.

Sergeant Freer testified that he received the gun from a police officer whom he believed was Officer Trappler. 3:36:9-13; 3:37:7-8. He identified Exhibit 2A as the gun that he received. 3:36:19-37:5. Exhibit 2A was admitted into evidence. 3:41:12-16.

Sergeant Freer testified that he took the gun back to headquarters. 3:37:20-22. He explained that he would have assigned an officer to place the gun on a property receipt. 3:37:25-38:2. He testified that he signed a property receipt for the gun, and he identified Exhibit 5 as the gun's property receipt. 3:38:16-39:10. He read into the record the property receipt number for the gun: No. 2695219. He confirmed this number as being the same number found on Exhibit 2A, the physical evidence of the gun. 3:41:3-4. Exhibit 5, the property receipt, was admitted into evidence. 3:39:12-15.

With respect to transporting the gun from his possession to the Firearms Identification Unit, Sergeant Freer testified that he did not transport the gun. 3:47:19-20. He explained that Police Officer Michael Brown must have transported the gun because Officer Brown is named on the property receipt and the Firearms Identification Unit will not accept a firearm

9

unless the person submitting it is the person on the receipt.
3:47:22-48:5.

Police Officer Robert Stott testified as an expert witness from the Firearms Identification Unit. He explained that generally, when an officer confiscates a firearm, the firearm is placed on a property receipt that identifies the make, model, and serial number of the weapon. The officer then brings the property receipt and the firearm to the Firearms Identification Unit and submits the firearm and a copy of the receipt to the Unit. 2:129:17-130:7.

Officer Stott identified Exhibit 2A as the firearm that he analyzed. 2:132:16-24. He explained that the firearm proved operable. 2:133:12-16. He also identified Exhibit 4, a copy of his report for the firearm. 2:131:18-132:3. He explained that the serial number found on the physical evidence of the gun was the same serial number identified on his report. 2:132:22-24. He did not compare the property receipt number on the physical evidence to that on his report. Exhibit 4 was admitted into evidence. 2:142:13-22.

D. The Parties' Closing Arguments and the Court's Jury Instructions

After the defendant rested his case, the parties gave the jury their closing arguments. As part of his closing, the defendant argued that the government did not establish a

sufficient chain of custody for the alleged drugs.  3:139:15-140:13.

After the parties completed their closing arguments, the Court provided the jury with their final jury instructions.[11] The Court included an instruction with respect to the chain of custody.  It read:

> [T]he defendant has raised the issue of
> defects in the chain of custody of the
> alleged drugs.  You may consider any defects
> in determining the authenticity of this
> evidence or what weight to give it.  The
> Government must prove beyond a reasonable
> doubt that the drugs recovered . . . were the
> same drugs that were chemically analyzed.

3:173:17-23.

II.  Oral Argument on the Defendant's Motion

At oral argument on April 27, 2010, the government produced all of the exhibits that the Court admitted into

---

[11] The Court bifurcated the trial.  During the first phase of the trial, the parties presented evidence with respect to the charges for distribution of heroin, distribution of cocaine, and possession of a firearm in furtherance of a drug trafficking crime.  The Court then provided the jury with instructions for those three charges only.  After the jury returned its verdict for the distribution charges and the Court declared a mistrial for the charge of possession of a firearm in furtherance of a drug trafficking crime, the parties presented evidence for the fourth charge, possession of a firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year.  The Court then provided the jury with final instructions for the fourth charge.  The final jury instructions referenced above are those provided during the first phase of the trial.

evidence.[12]  The Court compared the exhibits introduced to account for the first sale of drugs: Exhibit 1, the property receipt describing the alleged heroin; Exhibit 2B, the physical evidence of alleged heroin; and Exhibit 2C, the lab report from Mr. Varughese, identifying the substance tested as heroin.  The Court found that the exhibits all contained the same property receipt number: No. 2695213.  Arg. Tr. 4:20-5:2, Apr. 27, 2010.

The Court next compared the exhibits to account for the second sale of drugs: Exhibit 2, the property receipt describing the alleged cocaine and heroin, as well as the items confiscated during the execution of a search warrant; Exhibit 2A, the physical evidence of alleged cocaine and heroin and the items confiscated during the execution of a search warrant;[13] and Exhibit 13, the lab report from Mr. Madera that described a substance tested as containing cocaine.  The Court found that the exhibits all contained the same property receipt number: No.

---

[12] In its order scheduling oral argument, the Court told the government to produce all of the exhibits admitted at trial so that the Court could review them.  Although the government provided the Court on the third day of trial with a copy of exhibits and a list of all the exhibits admitted, the copy of the exhibits did not include identifying information about the physical evidence, nor did it include Exhibit 13, the lab report from chemist German Madera.  The list of exhibits also did not include Exhibit 13.

[13] The property receipt and the package containing the physical evidence of the drugs were both marked "Exhibit 2."  The Court described on record the contents of the actual items that were marked Exhibit 2 to avoid further confusion.  Arg. Tr. 9:2-12.

12

2695217.  Id. 9:2-12.

III. Analysis

In ruling on a motion for judgment of acquittal made pursuant to Rule 29 of the Federal Rules of Criminal Procedure, a district court must review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.  United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005).  When a defendant moves for judgment of acquittal and a court reserves decision on the motion, the court is limited to a review of the evidence as it existed when the ruling was reserved.  Fed. R. Crim. P. 29(b); United States v. Boria, 592 F.3d 476, 480 n.7 (3d Cir. 2010).  In this instance, the defendant moved for judgment of acquittal at the close of the government's case in chief, and after hearing the parties' arguments, the Court reserved on the motion.

Federal Rule of Evidence 901(a) provides that authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims it to be.  Fed. R. Evid. 901(a).  One way to establish authentication is to show the chain of custody for the evidence.  United States v. Grant, 967 F.2d 81, 82-83 (2d Cir. 1992).

The chain of custody for evidence does not need to be

perfect in order to establish the evidence's authenticity. 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 901.03[3] at 901-28 to -29 (Joseph M. McLaughlin ed.) (2d Ed. 2010). "The trial court may admit evidence if it determines, after considering the nature of the evidence and the surrounding circumstances, that the evidence is substantially in the same condition as when it was first gathered." Id. at 901-29. Breaks in the chain of custody go to weight, and not the admissibility, of the evidence. Id. at 901-29 to 901-30; United States v. Dent, 149 F.3d 180, 189 (3d Cir. 1998); see also, e.g., United States v. Jackson, 345 F.3d 59, 65 (2d Cir. 2003); United States v. Dixon, 132 F.3d 192, 197 (5th Cir. 1997). Absent actual evidence of tampering, a trial court may presume regularity in a public official's handling of contraband. Dent, 149 F.3d at 188-89.

  The defendant moves for judgment of acquittal, arguing that the government failed to establish a sufficient chain of custody to sustain the charges against him. He does not challenge the admissibility of the exhibits. Arg. Tr. 13:22-14:6, Apr. 27, 2010. Indeed, the Court admitted into evidence all of the exhibits at trial, and the defendant never objected to their admission. His motion then amounts to the assertion that no rational juror could find the defendant guilty of the charges against him because the government failed to establish a chain of

custody for the drugs and the gun.  The Court finds that, although the trial testimony with respect to a chain of custody for the evidence is very bare and the exhibit numbering was confusing and at times inaccurate, a rational juror could find the defendant guilty beyond a reasonable doubt based on the available evidence.

With respect to the heroin, Officer Myers described the packets that the defendant sold to him as four blue, glassine packets stamped "Everlast."  Officer Myers testified that the property receipt for the first drug sale contained this same description of the drugs.  Officer Myers testified to the general police practice of transporting drugs from police headquarters to the chemistry lab.  Chemist Ninan Varughese testified to general laboratory practice for receiving substances to be tested.  Mr. Varughese also testified that he analyzed four clear, heat-sealed, blue-glazed packets stamped "Everlast."  He identified Exhibit 2B as the physical drugs that he tested.  At oral argument, the Court was able to compare the heroin-related evidence consisting of the property receipt, the physical drugs, and the laboratory report, and it found that the property receipt number on these pieces of evidence was the same.  All of the exhibits were admitted into evidence during the government's case in chief, and the jury could have viewed them if it wished to do so.

With respect to the cocaine, Officer Myers described the packets that the defendant sold to him as two blue, glassine packets stamped "Everlast," containing alleged heroin, and two clear packets with blue number "1's" on one side, containing alleged cocaine.  Officer Myers identified the property receipt recording the narcotics purchased during the second drug sale.  He also identified Exhibit 2A as the physical drugs that he bought.  Chemist German Madera testified that he analyzed one of two clear ziploc packets containing white powder, and the white powder tested positive for cocaine.  The Court was able to compare the cocaine-related evidence consisting of the property receipt, the physical drugs, and the lab report, and it found that the property receipt number on these pieces of evidence was the same.

Although the property receipt contains a list of drugs that were both purchased during the second drug sale and confiscated during the execution of a search warrant, a rational juror could have found that the drugs tested were the same drugs that the defendant sold.  The property receipt delineates "Item 1" as the four packets of drugs purchased: two clear ziploc packets marked "#1" on one side containing white powder, and two blue glassine packets both marked "Everlast" containing white powder.  The laboratory report clearly delineates the analysis for Item 1.  It describes Item 1A as two ziploc packets

16

containing a "#1". Item 1A tested positive for cocaine. All of the exhibits were admitted into evidence during the government's case in chief, and the jury could have viewed them if it wished to do so.

The government argues that the Court should not consider the sufficiency of the evidence with respect to the gun charges because the defendant initially moved for judgment of acquittal solely for the drug offenses. The Court need not resolve this issue because it holds that the a rational juror could find the defendant guilty beyond a reasonable doubt of the gun charges based on the available evidence.

Officer Trappler testified that he recovered a gun, and he identified Exhibit 2A as the gun he recovered. Officer Trappler also testified that he delivered this gun to Sergeant Freer. Sergeant Freer testified that he received the gun from whom he believed was Officer Trappler. He identified Exhibit 2A as the gun he received. He explained that he had an officer place the gun on a property receipt, and he signed the property receipt. He confirmed that the property receipt number found on the physical evidence was the same as that on the property receipt. Officer Stott testified that he analyzed a gun, and the gun analyzed was that of Exhibit 2A. He testified that the gun proved operable. He confirmed the serial number of the gun found on the physical evidence and on his laboratory report. All of

17

the exhibits were admitted into evidence, and the property receipt number on the gun, property receipt, and lab report match.

IV. <u>Conclusion</u>

For the reasons herein stated, the defendant's motion for judgment of acquittal is denied. An appropriate order shall issue separately.